# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

    v.

CARLOS COLON, *et al.*

No. 3:14-cr-00085 (JAM)

## RULING ON DEFENDANTS' JOINT MOTIONS FOR DISCOVERY (Doc. #36) AND TO DISMISS THE INDICTMENT (Doc. #37)

This case involves seven criminal defendants who were set up by undercover law enforcement agents to rob a fictional drug "stash house" in Connecticut. They fell victim to a ruse that federal law enforcement agents have deployed with remarkable success against countless suspects nationwide. All seven defendants—some of them armed—gathered one day last April at a parking lot somewhere in Stamford, expecting that they would momentarily proceed to a nearby stash house to rob and help themselves to 15 kilograms or more of lightly guarded cocaine. Instead, a flood of law enforcement agents swept in to arrest them. Each of the defendants now stands charged with conspiracies to engage in robbery, drug trafficking, and related weapons offenses. For their plans to rob a house and cocaine that never existed, each of the defendants likely faces at least 15 years of mandatory minimum imprisonment if convicted on these charges.

Defendants jointly move to dismiss the indictment on the ground that the stash-house sting operation that was launched against them amounted to outrageous government conduct in violation of their constitutional rights under the Due Process Clause. Relatedly, defendants contend that they were targeted on account of their race in violation of the Equal Protection

1

Clause, and they seek discovery to support their claim of selective enforcement and prosecution. Although defendants raise important questions about stash-house sting operations, I conclude that defendants' arguments are all without merit under well-established law of the Supreme Court and Second Circuit. Accordingly, for reasons set forth below, I deny their motions to dismiss and for discovery.

BACKGROUND

In late March 2014, agents of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) initiated this stash-house sting operation. The focus of the ATF's efforts was on defendants Carlos (Joel) Colon and Carlos (Camby) Colon, both of whom had previously been the subjects of undercover controlled buys of cocaine and a sawed-off-stock rifle. Doc. #58 at 2–3 & n.2 (description with accompanying references to Drug Enforcement Administration (DEA) reports detailing undercover purchases in 2011, along with statements by Camby Colon to a DEA informant in November 2013 about his ability to deal in multiple-kilogram quantities of cocaine).

On March 24, 2014, ATF agents met with a confidential informant (CI-1) who had previously been working with law enforcement agents in Bridgeport from two multi-jurisdictional drug and gang task forces. CI-1 told the agents about multiple cocaine purchases he had made over the past 18 months at the Colon brothers' auto-detailing business in Bridgeport. Doc. #58, Exh. A; Transcript of Evidentiary Hearing of Sept. 29, 2014 (Sept. 29 Tr.) at 44 (CI-1 testimony). Although CI-1 had bought cocaine from Joel Colon, he thought that Camby Colon was in charge; Joel Colon had recently told him about a shipment of two kilograms of cocaine, and he believed that the Colon brothers had family in Puerto Rico that provided them with kilogram-quantities of cocaine to sell. Doc. #58, Exh. A.

Most importantly for present purposes, CI-1 also described to agents an encounter he had had with Joel Colon several months earlier, in which Joel Colon had asked CI-1 if he knew of any narcotics dealers that could be robbed and stated that, if CI-1 had problems with any narcotics dealers, Joel could arrange a robbery. Doc. #58, Exh. A; Sept. 29 Tr. at 24–26. CI-1 had previously relayed the substance of this encounter with Joel Colon to his FBI "handler," as corroborated by a contemporaneous FBI report of early December 2013.[1]

Soon after the meeting with CI-1, law enforcement set out to corroborate his claim that the Colon brothers engaged in narcotics dealings. On March 27, 2014, CI-1 and a second confidential informant (CI-2) bought an ounce of cocaine from Joel Colon at the Colon brothers' auto shop in a transaction that was secretly video recorded. Doc. #58 at 3–4. Several days later, CI-1 and CI-2 attempted, on April 1, to buy more cocaine from the Colon brothers, but were told that the product had not yet arrived. *Id.* at 4.

CI-2 returned again to the auto shop on April 3, and he asked Joel Colon whether he knew anyone who might do a robbery—specifically, whether he "kn[ew] anybody that, like, hit licks and shit?" Doc. #58, Exh. L-1 at 1:17–1:42 (video). Joel did not seem to understand what CI-2 was saying at first, but then when Camby joined the discussion, CI-2 said he was referring to "stick up kids," slang for people who commit robberies with weapons. *Id.* at 2:00–2:05. CI-2 said that he was acting on behalf of his "Cuban buddy" (who in reality was an ATF undercover agent who would be interposed in future dealings), and that CI-1 had "turned me on to y'all" to ask about this. *Id.* at 2:14–2:30. Joel Colon said that he would let CI-2 know. *Id.* at 2:46–3:01.

---

[1] An FBI report dated on December 10, 2013, states in relevant part: "On 12/06/2013, [CI-1] ran into Joel (Colon) in Bridgeport, Connecticut and gave him a ride to the store. Joel offered to front [CI-1] various quantities of cocaine and stated that shipment of cocaine was coming in from Puerto Rico. *Joel stated that that if [CI-1] knows anyone making money, that Joel has a boy with a gun who can rob them.* The unidentified person will not kill them, only rob them." Doc. #58, Exh. B (emphasis added); Def. Exh. #2 (emphasis added).

The conversation turned back to drug dealing, and Joel said that he could obtain "one, two, three bricks" (kilograms) and would provide 300 to 500 grams of cocaine on credit. *Id.* at 6:16–7:30. Referring to CI-1 (who was not there), Joel said that he and CI-1 "got the trust." *Id.* at 6:46–6:56.

Soon enough, the conversation turned back to planning a robbery. When Joel asked if the plan would involve cash, CI-2 said he did not know but would have Joel meet his Cuban friend. Joel then stated: "I got my people, I just fuckin' talk to them and, like, they do whatever they got to do." Doc. #58, Exh. L-2 at 0:08–0:14. And soon he added that "I just call two, three of my [friends] from the islands. They come over here, they do whatever they go back. Nobody know what they do, who they are. You just gotta let me know what, what, exactly, you need to get done." *Id.* at 0:29–0:54. CI-2 offered to have Joel meet his Cuban associate, and Joel said he could meet "whenever you ready, like tomorrow." *Id.* at 0:55–1:05.

CI-2 returned the next day to the auto shop with his Cuban friend, who in fact was an ATF undercover agent. The agent explained that he was a courier for a Cuban trafficking organization and was tasked with picking up one or two kilograms of cocaine from houses located off of I-95 in Connecticut; he would not learn the specific address of a stash house until a telephone call arrived on the day of each pick-up. He further explained that, whenever he did these pickups, he saw an additional 15 kilograms of cocaine at the stash house and that there were always two men present at the house, one of whom was armed.

When Joel questioned the agent about the number of kilograms of cocaine at the stash house, the agent confirmed there would be 15 kilograms. After explaining more about the pickup routine, the agent asked, "How does it sound?" Doc. #58, Exh. N at 5. Joel replied, "It sounds good." *Id.* at 6.

They agreed that the stolen cocaine would be split, with one half for the Colon brothers and their "island" associates, and one-half for the agent and CI-2. After more discussion of the details with the agent, Joel Colon said that "it can be done" and that he would "call the guys" and "get someone who no one knows, who are not from here . . . ." *Id.* at 7.

Camby Colon also asked questions about who would be armed at the stash house and advised that "who we are going to send, if they see that a weapon is drawn they are going to clean them out quickly," and that his associates "have done things around" and "know what they are doing," because the Colon brothers "use them whenever they owe us money . . . or big case or something like if someone fucked us up, and . . . was trying to screw with us, and it has to be resolved then we use those guys." *Id.* at 8–9.

On April 7, the Colon brothers again met with CI-2 and the ATF undercover agent at the auto shop. The agent advised that he would have another pick-up on Friday, April 11. He confirmed again that there would be at least 15 kilograms of cocaine. The agent also asked to meet with the crew that was going to do the robbery, and Camby said that he would make the crew available.

On April 9, the group met yet again at the Colon brothers' auto shop. The agent confirmed that the pickup would take place on April 11, when he would need to drive down to Stamford and wait for a call to provide him the address of the stash house. Defendant Hiram Mojica walked into the room and introduced himself as "Gringo." The agent explained the robbery to Mojica, answering Mojica's questions about the possibility of encountering additional individuals and the proximity of police. Mojica mentioned the possibility of entering with a silencer and shooting the first individual in the thigh. Joel Colon said that the guards at the stash house "aren't stupid" and would save their lives rather than save the cocaine. Joel Colon advised

the agent that he would meet the remaining crew the next day.

On April 10, the agent and CI-2 returned to the auto shop, and they were introduced to defendants Humberto Soto and Markus Mendez. The agent explained the robbery plan and answered questions. Mendez wanted information about the location of the house, the individuals in the house, and the possibility of guns. Soto made numerous comments indicating that this would not be his first robbery and that he would shoot anyone who pulled out a weapon. He wanted to obtain a pump action shotgun (a "spreader") for the robbery, but stated that "[e]ven if nobody got a gun on, I don't give a fuck, I'll still walk in, I got hands . . . . I gots to tape those motherfuckers up, give us enough time to escape, to get the fuck out of there." Doc. #58, Exh. T-2 at 7. Soto suggested that they wear all-black clothing and gloves and consider drawing fake tattoos on their exposed skin.

The next day—April 11, the day the robbery was to take place—CI-2 met one last time with the Colon brothers, Mojica, and Soto at the auto shop in Bridgeport. The group then traveled to Stamford to await the supposed phone call to the agent about the location of the stash house. They were eventually joined by two more cars with the remaining three defendants: Markus Mendez, Nelson Diaz, and Trevor Pierce. Diaz and Soto had just purchased duct tape and gloves from an auto parts store in Stamford. Joel Colon assured CI-2 that the group had guns.

Eventually, all three cars with CI-2 and the seven defendants traveled to a parking lot in Stamford to meet the ATF undercover agent. Once there, the agent greeted the new crewmembers, Diaz and Pierce, and talked through with them the protocol for the robbery, including that one of the guards in the house would be armed and that they would find 15 kilograms of cocaine. The agent spoke with Diaz and Pierce about how he would "go on the

floor" when the robbery began so that he would not be shot. Doc. #58, Exh. V at 6.

A short time later, the agent gave a prearranged signal, and all the defendants were immediately arrested.[2] A search of each of two cars brought by the defendants revealed two loaded handguns as well as gloves and duct tape, among other items. A later search warrant at the Colon brothers' auto shop revealed several dozen rounds of ammunition, a small baggie of crack cocaine, and two digital scales.

The indictment charges all seven of the defendants with three different conspiracies: to engage in a Hobbs Act robbery affecting interstate commerce (18 U.S.C. § 1951(a)), to possess with intent to distribute more than five kilograms of cocaine (21 U.S.C. § 846), and to possess a firearm in furtherance of a crime of violence or drug trafficking offense (18 U.S.C. § 924(o)). The indictment further charges all seven defendants with possession of a firearm in furtherance of a crime of violence or drug trafficking offense (18 U.S.C. § 924(c)), and it also charges defendants Camby and Joel Colon with separate drug trafficking offenses (21 U.S.C. §§ 841, 846).

### DISCUSSION

Defendants have jointly moved to dismiss the indictment on the grounds of outrageous government conduct (Doc. #38) and for discovery as to their claims of selective enforcement on the impermissible basis of race (Doc. #36). On September 29, 2014, I held an evidentiary hearing on these motions, at which CI-1 and Joel Colon testified. On November 7, 2014, I held an additional evidentiary hearing at which CI-1's "handler," FBI Special Agent Nathaniel Gena, testified.[3]

---

[2] By separate ruling issued today, I have denied defendants' motions to suppress statements made by them and surreptitiously recorded by the government while defendants were held in police vehicles at the scene of their arrest.

[3] Upon motions of the defendants, I required the government to produce CI-1 and Special Agent Gena to

### Motion to Dismiss for Outrageous Government Conduct

The Due Process Clause protects a criminal defendant from conviction by means of government methods of investigation that are no less than outrageous—that violate "'fundamental fairness, [and are] shocking to the universal sense of justice.'" *United States v. Russell*, 411 U.S. 423, 432 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)); *see also United States v. Bout*, 731 F.3d 233, 239 (2d Cir. 2013). Although such claims of outrageous government conduct are frequently raised, they seldom succeed, because "the burden of establishing outrageous investigatory conduct is very heavy" in light of the "well-established deference to the Government's choice of investigatory methods." *United States v. Rahman,* 189 F.3d 88, 131 (2d Cir. 1999) (citations omitted); *see also United States v. Dyke*, 718 F.3d 1282, 1285–89 (10th Cir. 2013) (describing development and critiques of the outrageous-government-conduct defense).

What amounts to outrageous government conduct in the investigatory context defies precise verbal formulation. The Second Circuit has defined it through examples of what it is and what it is not. On the one hand, "'[g]enerally, to be 'outrageous' the government's involvement in a crime must involve either coercion or a violation of the defendant's person.'" *Bout*, 731 F.3d at 238 (quoting *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)). As Judge Friendly once suggested, "there is certainly a limit to allowing governmental involvement in crime," and

---

testify, but I denied defendants' motions to require the testimony of CI-2 or the ATF special agent involved with the investigation of this case. Docs. #72, #103. *See United States v. Dyman*, 739 F.2d 762, 768–69 (2d Cir. 1984) (not error for trial court to decline to conduct full evidentiary hearing before trial on outrageous government conduct claim). My view was—and remains—that the crux of defendants' claims is that the government initiated this sting operation without an appropriate basis and with intent to victimize poor and desperate minorities. From my perspective, it was possibly significant to this claim of outrageous government conduct to determine if there was strong reason to doubt the government's contention that Joel Colon had initially suggested the possibility of a robbery to CI-1 or if there was reason to believe that the government had manipulated CI-1 from the start to have him target the Colon brothers for a stash-house scheme rather than to pursue other crimes or potential (non-minority) targets. By contrast, neither CI-2 nor the ATF agents—all of whom became involved after the alleged robbery-related conversation between CI-1 and Joel Colon in December 2013—could offer testimony that would dispel a lack of predicate for the investigation and a reason to focus on the Colon brothers.

"[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973) (footnote omitted).

All that said, the government's use of manipulative, sneaky, and deceitful investigative methods does not, without more, rise to the level of a constitutional outrage. "'It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. . . . Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct.'" *Bout*, 731 F.3d at 238 (quoting *Al Kassar*, 660 F.3d at 121); *United States v. Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013) (same), *cert. denied*, 135 S. Ct. 53 (2014).

By the same token, the government's use of a "sting" operation—deceptive and controversial as such operations might sometimes be—is not *per se* outrageous.[4] To the contrary, "'as with all sting operations, government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits.'" *Bout*, 731 F.3d at 138 (quoting *Cromitie*, 727 F.3d at 219). Nor are the federal courts—even when faced with government methods they find unsavory or unwise—at liberty to "fashion their own sub-constitutional limitations on the conduct of law enforcement

---

[4] The term "sting" operation ordinarily refers to the government's use of false promises and pretenses for the purposes of enticing an individual to commit a crime. Judge Posner has observed that "a sting operation is merely a theatrically elaborated method of deploying undercover agents in criminal investigations." *United States v. Hollingsworth*, 9 F.3d 593, 597 (7th Cir. 1993). And as one commentator has noted, sting operations well pre-date (and have survived) the development of modern due process jurisprudence:

> The first modern police forces employed professional criminals as double agents to provoke crimes that would then be punished. Church inquisitors covertly urged parishioners to commit heresy, and excommunicated (or worse) those who fell for the ruse. Tsars and other autocrats routinely tested the loyalty of their underlings by employing agents provocateurs. (Z.B. Zubatov, a Tsarist police chief, told dissidents: "We shall provoke you to acts of terror and then crush you," . . . .) Even the gods have used sting operations; the biblical lord's purpose in ordering Abraham to slay his beloved Isaac was apparently to tempt him to commit the crime of disobedience. The suffering of Job was also a sting of sorts, testing his loyalty.

Bruce Hay, *Sting Operations, Undercover Agents, and Entrapment*, 70 MO. L. REV. 387, 392 n.15 (2005).

9

agents." *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996) (internal quotation marks and citation omitted).

A proper claim of outrageous government conduct stands distinct from a claim of entrapment. *See United States v. Dyman*, 739 F.2d 762, 768 (2d Cir. 1984). While a claim of entrapment focuses on the predisposition of a defendant to commit a crime, *United States v. Myers*, 692 F.2d 823, 836 (2d Cir. 1982), a claim of outrageous government conduct focuses on whether police conduct is "so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *Al Kassar*, 660 F.3d at 121.

In light of these standards, it is readily apparent that defendants here have not shown outrageous government conduct. To begin with, there is no evidence that law enforcement coerced or physically violated any of the defendants in order to convince them to participate in the drug stash-house robbery scheme. Although defendants contend that they were especially economically vulnerable, there is scant evidence that law enforcement officers were aware of this vulnerability.[5] In any event, the government's exploitation of a suspect's vulnerability or susceptibility to commit a crime is not the equivalent of actual coercion. *See, e.g.*, *United States v. Muntasir*, 2012 WL 4955247, at *3 (D. N.J. 2012) (government's exploitation of "economically-vulnerable status of a federal prisoner, far from a rarity, does not transform the government's investigative tactics, even where deceitful, to 'outrageous conduct'").

Nor was the financial inducement here coercively extravagant. Based on the stated plan

---

[5] Defendants have submitted affidavits stating that they were all experiencing financial distress. *See* Doc. #38-1, Exh. F at 20–22 (Joel Colon Aff.), Exh. G at 25–26 (Camby Colon Aff.), Exh. H at 29 (Diaz Aff.), Exh. I at 34–35 (Mojica Aff.), Exh. J at 38 (Soto Aff.), Exh. K at 43 (Pierce Aff.), Exh. L at 48 (Torres Aff.). Defendants do not claim that any governmental official knew of their particular economic circumstances. They claim only that Joel Colon told CI-1 that he was "going through a lot" and had been evicted, and they otherwise surmise from CI-1's "long association with the Colon brothers" that he "would have known" of Camby Colon's difficulties. Doc. #38 at 2.

of the participants to divvy up the cocaine proceeds, each of the seven defendants stood to gain perhaps a kilogram of cocaine each, worth at most nearly $40,000 according to Camby Colon's own recent estimate of the street-value of a kilogram of cocaine. Doc. #58 at 3 n.2. I cannot conclude that this amount of expected gain would, *perforce*, overbear the free will of any of the defendants to resist from participating in a violent robbery. *Cf. Cromitie*, 727 F.3d at 221 (noting that "[a] large sum reflecting the going rate for murder-for-hire might exceed due process limits if offered to induce the sale of a small quantity of marijuana").

Defendants' primary argument is that they were unfairly targeted in the absence of evidence to indicate that they wished to perpetrate a drug stash-house robbery in the first place. But this "targeting" argument may—at best—be properly raised only by the Colon brothers, as there is no evidence that the government directed its scheme at any of the other five defendants, all of whom were recruited by the Colon brothers only after the plan took shape and without the government's input concerning whom the Colon brothers would recruit. So far as the government knew, the Colon brothers were bent on recruiting thugs from "the islands" who had done the defendants' dirty work for them before. These recruits—the five remaining defendants—do not have standing to complain about the government's targeting of the Colon brothers. *See United States v. Williams*, 547 F.3d 1187, 1199 n.10 (9th Cir. 2008); *United States v. Wingender*, 790 F.2d 802, 803 (9th Cir. 1986).

Nor—even assuming that they have standing—may the five non-Colon defendants properly claim injury from the fact that they became embroiled in this scheme without the government's having antecedent grounds to think that each one of them was deserving of investigation and prosecution. The question here is "whether the *government's* conduct was outrageous in conducting this criminal investigation," and "[a]s long as the government's

investigation was initiated and performed tolerably with respect to the operation as a whole, it would undermine law enforcement's ability to investigate and apprehend criminals if its otherwise acceptable conduct became outrageous merely because an individual with no known criminal history whom the government did not suspect of criminal activity joined the criminal enterprise at the last minute at the behest of codefendants." *United States v. Black,* 733 F.3d 294, 307 n. 11 (9th Cir. 2013) (emphasis in original), *cert. denied*, 135 S. Ct. 267 (2014).

This applies with particular force against Mendez's claim that the government's conduct was outrageous as to him individually. Docs. #67 at 3–5, #102 at 1. His claim is based on a single remark uttered by Soto the day before the proposed robbery, in which Soto indicated that he was "worr[ied] about [Mendez] . . . but I don't know, whatever." Doc. #58, Exh. T-2 at 14. Mendez argues that this comment referred to Mendez's alleged cognitive disabilities and that it was outrageous for the government, after hearing it, not to conduct a background investigation into Mendez's prior criminal record and learning disabilities to determine whether he should be removed from the next day's operation. Without significantly more, I cannot find that the government's conduct with regards to Mendez—by not immediately latching onto a single, highly ambiguous remark—was "so offensive that it shocks the conscience." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (internal quotation marks and citation omitted).

As to the Colon brothers, there is no evidence that the government targeted them because of their Hispanic race and in violation of the Equal Protection Clause. Defendants point to no statement or other evidence indicating any race-based motive by any governmental actor. The government otherwise had an ample historical basis—not seriously disputed by the Colon brothers—to investigate and focus on them. This included the undercover purchase of a firearm from the Colon brothers in 2011, as well as controlled purchases from Camby Colon in 2011,

and also additional dealings through a confidential informant with Camby Colon in 2013 that reflected his involvement in kilogram-quantities of cocaine dealing. And it includes the controlled purchase of cocaine at the Colon brothers' auto shop just days before the stash-house scheme was proposed to them.

This alone suffices to conclude that the government did not act arbitrarily—much less invidiously or outrageously—in targeting the Colon brothers. But apart from all this, I also credit the government's evidence that Joel Colon spoke to CI-1 in early December 2013 about his willingness to take part in a robbery. The substance of this conversation was contemporaneously communicated by CI-1 to Special Agent Gena and duly documented in an FBI report. More than three months later, CI-1 related substantially the same information when re-interviewed by ATF agents on March 24, 2014. In addition, CI-1 testified credibly concerning his conversation with Joel Colon in early December 2013:

> Q. Directing your attention to December 6, 2013, did you have a conversation with Joel Colon?
> A. Yes.
> Q. How did you come to have a conversation with Joel Colon that day?
> A. I was riding. I was riding, I was going somewhere and I seen him walking to a store.
> Q. And what happened?
> A. He got in the car with me and I picked him up, and we was driving to the store. And he asked me do I know anything about anybody that sells drugs that I want to be robbed or anybody that owes me money, do I want to set them up to be robbed.
> Q. What did he -- did he say anything further with respect to the robberies?
> A. That there won't be no killing.
> Q. Did he say how the robberies would be done, whether he would do them?
> A. No.
> Q. What did he say about who would do the robbery?
> A. He just said that he has somebody that he could set robberies up for people, do I know anybody to be robbed.
> Q. Would those people be armed or not armed?
> A. Armed.

Sept. 29 Tr. at 24–25. As the Second Circuit makes clear, once the government learns that a

13

potential target has expressed a desire to commit a serious crime, law enforcement agents are

entitled—even obligated—to "test how far [defendant] would go." *Cromitie*, 727 F.3d at 219.

On cross-examination, CI-1 further testified—credibly—that law enforcement officers

did not manipulate him to focus on acquiring information from Joel Colon about robberies, as

distinct from drug dealing or other species of wrongdoing:

> Q. And what did you talk about? What was that detective interested in from you?
> A. When I first got arrested?
> Q. Yes.
> A. Drugs.
> Q. What else?
> A. The first time - -
> Q. I'm sorry?
> A. The first time I met with anybody after my arrest, the first thing we talked about was drugs.
> Q. And then as time moved on, what were any of your handlers interested in hearing from you about? What were they interested in?
> A. Whatever I had.
> Q. What did they say? Did they say murders, homicide, drugs? Did they say those words?
> A. I can't remember. Whatever I had, I came to them with my own information. And we acted on it in that way.
> Q. Did you ever asked [sic] them what they were interested in?
> A. Not that I recall.
> . . . .
> Q. Can I ask you this. Between July of 2013 and December of 2014, did any of your handlers, ATF, FBI, local police, instruct you to get any information on any robberies?
> A. No.

Sept. 29 Tr. at 63–64 & 66.

> Q. . . . Has the ATF or the FBI told you that they're interested in getting information about people that are willing to do robberies?
> A. No.
> Q. They've never suggested to you that that's a good way to get the leniency you're looking for?
> A. No.

*Id.* at 117. Special Agent Gena testified as well that he did not coach CI-1 to engage the

Colon brothers specifically or to focus on inducing information about potential robberies.

CI-1 was candid about his motives for cooperating and testifying, in hopes of leniency with respect to his pending criminal charges. *See, e.g.*, Sept. 29 Tr. at 23, 33, 71, 73, 75. And he testified that he told the agents that he had never known Joel Colon to have been involved in any type of robbery prior to his December 2013 conversation—a fact that went against CI-1's own interest in gaining leniency by supplying information about Joel Colon's criminality. *Id.* at 52–53.

To be sure, there were slight discrepancies between what CI-1 reported to the FBI about his conversation with Joel Colon in December 2013 and what he later reported to the ATF in March 2014, *see* Sept. 29 Tr. at 49–51, but these discrepancies were not material and are most plausibly accounted for by ordinary lapses in memory with the passage of time. Moreover, insofar as CI-1 reported to law enforcement that the Colon brothers were engaged in narcotics dealing, this was amply corroborated within days by a controlled purchase from Joel Colon and numerous recorded drug-related conversations with both Colon brothers.

I do not credit the contrary testimony of Joel Colon and his denial that he and CI-1 spoke of a robbery when they saw each other in December 2013. He offered a sworn affidavit and sworn testimony that he had not dealt in large quantities of narcotics (*id.* at 131; Doc. #38-1, Exh. F at ¶ 22), but this was significantly undermined by his tape-recorded statements during the course of this investigation, indicating his transaction in kilogram-quantities of cocaine. *See, e.g.*, Doc. #58, Exh. K at 3:20–3:45; *id.*, Exh. L-1 at 6:16–7:30.

Nor can I conclude there is anything amiss about the time lag between CI-1's December 2013 meeting with his FBI handler and his March 2014 meeting with the ATF. To the contrary, this passage of several months' time suggests that the robbery-related conversation between CI-1 and Joel Colon was not hastily engineered in the first instance by the government as a pretext for

initiating a stash-house sting.

In short, for purposes of this pending motion to dismiss the indictment, I conclude that the government's focus on the Colon brothers was amply justified on the basis of their prior weapon and narcotics activity alone, as well as on the basis of the information the government received from CI-1 concerning Joel Colon's willingness to participate in a robbery. By any objective measure, it was far from an outrage for the government to focus on the Colon brothers. Because of this factual predicate for the government's focus on the Colon brothers, I need not resolve whether a claim for outrageous government conduct could be sustained had the government chosen its targets at random or by whim.

Defendants complain that the government has propagated similar stash-house sting operations across the United States. But it is axiomatic that a criminal defendant does not have standing to complain about alleged misconduct by the government against third parties such as suspects elsewhere in the country. *See, e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990) (Arkansas death row inmate lacked standing in his individual capacity to raise a constitutional challenge against the conviction and death sentence imposed on another Arkansas death row inmate). Nor have defendants shown that other district court cases are comparable, in terms of the factual predication that existed in those cases.[6]

In an unpublished decision, the Second Circuit has rejected an outrageous-government conduct-challenge to a DEA stash-house sting operation. *United States v. Tribble*, 320 F. App'x 85, 87 (2d Cir. 2009). To date, no other federal court of appeals has invalidated a stash-house

---

[6] For example, defendants rely on *United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014). But in that case there was "no indication" that the ATF knew of the target's "criminal background or propensity" prior to launching a stash-house sting. *Id.* at 779 (internal quotation marks omitted). The court in *Hudson* stated that "[i]f the Government were to actually have knowledge that a particular person had engaged in similar conduct in the past—or at least had suspicions based on identifiable facts—then the Government should and does have free rein consistent with constitutional restrictions to go after those individuals." *Id.* at 780–81. At least two other federal districts have declined to dismiss indictments involving a similar stash-house sting. *See United States v. Thorne*, 2014 WL 4700687, at *6 (W.D.N.C. 2014); *United States v. Graham*, 2014 WL 4105978, at *3–4 (E.D. Pa. 2014).

sting indictment on outrageous-government-conduct grounds. *See United States v. Sangalang*, 2014 WL 2884553, at *1 (9th Cir. 2014); *United States v. Hullaby*, 736 F.3d 1260, 1262–63 (9th Cir. 2013); *Black*, 733 F.3d at 310; *United States v. Johnson*, 534 F. App'x 592, 593–94 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1338 (2014); *United States v. Velasquez-Lopez*, 510 F. App'x 559, 560-61 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 306 (2013); *United States v. Lopez-Mejia*, 510 F. App'x 561, 563 (9th Cir. 2013); *United States v. Rolon*, 445 F. App'x 314, 322–23 (11th Cir. 2011); *United States v. Briggs*, 397 F. App'x 329, 332 (9th Cir. 2010); *United States v. Mose*, 333 F. App'x 200, 203 (9th Cir. 2009); *United States v. Williams*, 547 F.3d 1187, 1199–1201 (9th Cir. 2008); *United States v. Donjoie*, 230 F. App'x 884, 887–88 (11th Cir. 2007); *United States v. Orisnord*, 483 F.3d 1169, 1176 (11th Cir. 2007); *United States v. Paisley*, 178 F. App'x 955, 961–62 (11th Cir. 2006); *United States v. Bell*, 147 F. App'x 665, 667 (9th Cir. 2005); *United States v. Sanchez*, 138 F.3d 1410, 1413–14 (11th Cir. 1998).

The Ninth Circuit, for example, has rejected such challenges, despite the fact that it applies a far more lenient test than the Second Circuit to evaluate outrageous-government-conduct challenges and despite facts suggesting in one case that the government had not targeted the defendants on grounds of known prior criminal activity. *See Black*, 733 F.3d at 302–10. The Ninth Circuit applies a multi-factor test for outrageous-government-conduct claims that includes factors that have not been identified as significant by the Second Circuit. *See id.* at 303 (factors include "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue").

17

And even applying these broader factors, the Ninth Circuit in *Black* affirmed a conviction despite evidence that the defendants were ensnared by means of a governmental operative who simply "trolled" bad parts of town in search of vulnerable targets. *Id.* at 303, 305. What mattered more in *Black* was that the defendants quickly responded to the proposal for a stash-house robbery, and their subsequent statements made clear their criminally violent history and, for one of the defendants, that he had "the connections necessary to carry out another such robbery with his 'goons.'" *Id.* at 307. In the instant case, too, the Colons responded quickly to the robbery proposal and boasted of their henchmen connections in "the islands" who would assist them in carrying out the crime.

Many thoughtful judges and commentators have critiqued the ATF's stash-house sting operations. They have raised concerns about whether it is wise and just to entice citizens by false pretense to commit crimes and about the severe sentencing consequences that may follow when a sentence is based on facts (such as drug quantity) that have been dreamed up by the government. "In this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them— people who but for the government's scheme might not have ever entered the world of major felonies." *United States v. Black*, 750 F.3d 1053, 1057 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of r'hrg en banc); *see also Black*, 733 F.3d at 318 (Noonan, J., dissenting) ("the ATF's actions constitute conduct disgraceful to the federal government[,]" and "[i]t is not a function of our government to entice into criminal activity unsuspecting people engaged in lawful conduct; not a function to invent a fiction in order to bait a trap for the innocent; not a function to collect conspirators to carry out a script written by the government"); *United States v.*

*Kindle*, 698 F.3d 401, 414, 416 (7th Cir. 2012) (Posner, J., dissenting) (stash-house stings "are a disreputable tactic" because "[l]aw enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences" and because they make actual stash houses "more secure by reducing the likelihood of their being robbed"), *cert. denied*, 133 S. Ct. 1743 (2013), *rev'd en banc sub nom. United States v. Mayfield*, 2014 WL 5861628 (7th Cir. 2014) (vacating and remanding the case for a new trial to present evidence of entrapment); Eda Katharine Tinto*, Undercover Policing, Overstated Culpability*, 34 CARDOZO L. REV. 1401, 1446–51 (2013) (critiquing stash-house sting operations and concluding that "[t]he inducements used to persuade suspects to commit, or simply to agree to commit, a serious and severely sentenced set of crimes elicits significant questions regarding the extent of the defendants' blameworthiness and the possibility that the mandatory sentence will be disproportional to any determination of culpability").

Yet more has been said generally about whether and how the use of police deception promotes the law's legitimacy and its didactic and expressive functions. *See, e.g.*, Elizabeth E. Joh, *Breaking the Law to Enforce It: Undercover Police Participation in Crime*, 62 STAN. L. REV. 155, 190–91 (2009) (describing the harms of law enforcement "engaging in authorized crime"); *see generally* Tracey L. Meares, *The Good Cop: Knowing the Difference Between Lawful or Effective Policing and Rightful Policing—And Why It Matters*, 54 WM. & MARY L. REV. 1865 (2013) (presenting a view of "rightful policing" that depends primarily on the procedural justice or fairness of police conduct, rather than the actual lawfulness or even crime-fighting efficacy of police conduct); Tracey L. Meares, Tom R. Tyler, & Jacob Gardener, *Lawful or Fair? How Cops and Laypeople View Good Policing* 138–144 (Yale Law Sch., Pub. Law Working Paper No. 255, 2012), *available at*

19

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2116645 (using nationwide data to argue that public judgments about police officers' behavior are influenced far more strongly by evaluations of procedural justice than by the actual lawfulness of police action).

Whether I agree with any of these concerns, I am bound to follow the law of the Second Circuit. Unless the Second Circuit is prepared to reconsider or modify its precedent in this field, the facts of this case fall well short of establishing an indictment that is the product of outrageous government conduct in violation of the Due Process or Equal Protection Clauses.

### *Motion for Discovery re Selective Enforcement/Prosecution*

Defendants also move for discovery to support their claim of racially selective enforcement/prosecution. As noted above, defendants to date have not identified any evidence of racial animus against them on behalf of any governmental actor involved in this case. Nor have defendants met the demanding standard set forth by the Supreme Court to allow them discovery in support of such a claim. In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court held that the requisite showing to establish entitlement to discovery was "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Id*. at 468 (internal quotation marks and citation omitted). To make a "credible showing" of discriminatory effect, *id.* at 470, a defendant must produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Id* at 469.

Thus, on the facts of *Armstrong* (involving a claim by black defendants that they were racially selected for crack cocaine prosecutions), it was not enough that defendants offered a list of 24 crack cocaine cases, all of which involved black defendants. *Id.* at 459. This list was insufficient for lack of data showing that "similarly situated persons of other races" were not

prosecuted in federal court. *Id*. at 470. The Court further held that the "study" proffered by respondents in support of their motion was insufficient because it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id*.

Defendants claim that the ATF's conduct in approaching the Colon brothers and proceeding to enact the sting operation against the rest of the defendants, all of whom are Hispanic or black, constitutes "disparate and racially biased enforcement." Doc. #36 at 1. But there is no evidence that the government did anything to select any of the seven defendants except for the two Colon brothers, who themselves chose their own co-conspirators. And even as to the Colon brothers, defendants furnish no evidence regarding similarly situated comparators— that is, individuals who were not Hispanic, who had similar prior criminal involvement, and whom the ATF could have targeted but did not. *Armstrong*, 517 U.S. at 470.

Defendants have not presented meaningful statistical evidence to support their claim of discriminatory intent. I cannot responsibly rely, without more, on a newspaper article from USA TODAY that defendants cite as evidence of disproportionate charging of racial minorities in stash-house sting operations.[7] *See United States v. Difeaux,* 163 F.3d 725, 729 (2d Cir. 1998) (newspaper articles alleging racism at prosecutor's office were insufficient grounds for court to conduct evidentiary hearing).

To the extent that defendants cite statistics from Connecticut and elsewhere of the number of minority defendants charged in ATF stash-house schemes, these statistics—if reliable—do not cure defendants' failure to adduce evidence of similarly situated comparators. *See United States v. Bass*, 536 U.S. 862, 864 (2002) (*per curiam*) (nationwide statistics

---

[7] *See, e.g.*, Brad Heath, *Investigation: ATF drugs stings targeted minorities*, USA Today (July 20, 2014, 10:19 PM), *available at* http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-profiling/12800195/ (last visited Nov. 14, 2014).

demonstrating racial disparities in charging and plea-bargaining do not fulfill the *Armstrong* requirement for showing relevant comparators because "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*") (emphasis in original).[8]

### CONCLUSION

For the foregoing reasons, Defendants' Joint Motion for Dismissal of Indictment on the Grounds of Outrageous Government Conduct (Doc. #37) and Joint Motion for Discovery (Doc. #36) are DENIED. This ruling is without prejudice to defendants' rights to renew their motions during or after trial as any additional evidence may warrant.

It is so ordered.

Dated at Bridgeport this 17th day of November 2014.


/s/_____
Jeffrey Alker Meyer
United States District Judge

---

[8] Although defendants cite numerous stash-house sting cases from the Northern District of Illinois in which discovery has been granted, the statistical data is far more extensive there because of the number of cases; in any event, I am unable to see how these decisions are consistent with *Armstrong* and *Bass* to the extent that defendants have not introduced comparator evidence or other evidence from which an inference about both discriminatory effect and intent can be drawn. *See United States v. Washington*, 2014 WL 2959493 (E.D. Pa. 2014) (denying discovery and critiquing contrary decisions of the Northern District of Illinois for same reason).